UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------

GIUFFRE MOTOR CAR CO., LLC d/b/a
GIUFFRE KIA, GIUFFRE HYUNDAI, LTD. and
JOHN GIUFFRE,

                Plaintiffs,

           v.

KIA MOTORS AMERICA, INC., HYUNDAI
MOTOR AMERICA and HYUNDAI CAPITAL
AMERICA, INC.,

                Defendants.

**MEMORANDUM & ORDER**
15-CV-4514 (MKB)

------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Plaintiffs Giuffre Motor Car Co., LLC, doing business as Giuffre Kia ("Giuffre Kia"),

Giuffre Hyundai, Ltd. ("Giuffre Hyundai") and John Giuffre commenced this action on March

12, 2015, against Defendants Kia Motors America, Inc. ("Kia"), Hyundai Motor America

("Hyundai") and Hyundai Capital America, Inc. ("Hyundai Capital") in the Supreme Court of the

State of New York, Kings County. (Notice of Removal ¶ 1, Docket Entry No. 1). Plaintiffs

alleged several claims arising from Kia's termination of its franchise agreement with Giuffre Kia

and from Hyundai's termination of its franchise agreement with Giuffre Hyundai. (Compl.,

Docket Entry No. 8.) On August 3, 2015, Defendants removed the action from the New York

Supreme Court, Kings County, to the United States District Court for the Eastern District of

New York on the basis of both federal question and diversity jurisdiction.[1] (Notice of Removal

¶¶ 5–8.)

---

[1] The Notice of Removal was filed on behalf of Hyundai and Kia only. (Notice of
Removal 1.) On August 4, 2015, Hyundai Capital consented to removal. (Docket Entry No. 4.)

On November 4, 2015, Plaintiffs filed an Amended Complaint asserting thirteen claims, consisting of two claims against Hyundai, ten claims against Kia and one claim against Hyundai Capital. (Am. Compl., Docket Entry No. 21.) Plaintiffs sue Hyundai for price discrimination in violation of the Robinson–Patman Act, 15 U.S.C. § 13, and the New York Franchised Motor Vehicle Dealer Act, N.Y. Veh. & Traf. Law § 460 *et. seq.* (the "New York Dealer Act"), and for failure to repurchase inventory at fair and reasonable compensation in violation of the New York Dealer Act. (*Id.* ¶¶ 53–79.) Plaintiffs sue Kia for unreasonably withholding consent to the sale of Giuffre Kia's motor vehicle dealership in violation of the New York Dealer Act and in violation of the California Vehicle Code, Cal. Veh. Code § 11713.3 *et. seq.*; for imposing a contractual term that is contrary to public policy in violation of the California Civil Code, Cal. Civ. Code § 1668; for imposing unreasonable restrictions on the sale of Giuffre Kia's motor vehicle dealership in violation of the New York Dealer Act and in violation of the California Vehicle Code; for failing to repurchase inventory at fair and reasonable compensation in violation of the New York Dealer Act; for failing to comply with the terms of its franchise agreement in good faith in violation of the Automobile Dealer's Day in Court Act, 15 U.S.C. § 1221 *et seq.* ("ADDCA"); and for fraudulent inducement, tortious interference with contract, and breach of the implied covenant of good faith and faith dealing. (*Id.* ¶¶ 80–281, 293–296.) Plaintiffs sue Hyundai Capital for failure to repossess and sell inventory in a commercially reasonable manner. (*Id.* ¶¶ 282–92.)

Hyundai moves to dismiss Plaintiffs' price-discrimination claims, and Kia moves to dismiss all claims asserted against it for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2] (Kia and Hyundai Mot. to Dismiss ("Defs. Mot."), Docket

---

[2] Hyundai Capital has not moved to dismiss the Amended Complaint.

Entry No. 26.)  For the reasons discussed below, the Court grants the motions to dismiss and dismisses Plaintiffs' price-discrimination claims against Hyundai and all claims against Kia.

## I.  Background

### a.  The parties

Kia and Hyundai are California corporations that manufacture, distribute and sell vehicles to franchised vehicle dealerships.  (Am. Compl. ¶¶ 5–6, 8, 15.)  Hyundai Capital is a California corporation that provides financing to Kia and Hyundai dealerships.  (*Id.* ¶¶ 7, 26.)  Giuffre Kia and Giuffre Hyundai are New York limited liability companies (*Id.* ¶¶ 2–3.)  John Giuffre is the principal and sole member of Giuffre Hyundai and Giuffre Kia.  (*Id.*¶¶ 40, 43–44.)  In September of 1998, Giuffre Hyundai and Hyundai entered into a franchise agreement (the "Hyundai Franchise Agreement"), which granted Giuffre Hyundai the right to operate a Hyundai franchise and sell Hyundai vehicles.  (*Id.* ¶ 37.)  In or about 2006, Giuffre Kia and Kia entered into a franchise agreement (the "Kia Franchise Agreement"), which granted Giuffre Kia the right to operate a Kia franchise and sell Kia vehicles.  (*Id.* ¶ 41.)  Hyundai Capital provided financing to Giuffre Kia, contingent upon Giuffre Kia continuing to operate a Kia dealership, and also provided financing to Giuffre Hyundai, contingent upon Giuffre Hyundai continuing to operate a Hyundai dealership.  (*Id.* ¶¶ 47, 65, 95.)

### b.  Hyundai subsidies to competing franchisees

In 2010, Giuffre Hyundai learned that Hyundai was providing advertising subsidies to competing Hyundai franchisees.  (*Id.* ¶ 54.)  Plaintiffs allege that the subsidies gave the competing Hyundai franchisees a competitive advantage over Giuffre Hyundai.  (*Id.* ¶ 55.)  Giuffre Hyundai threatened to sue Hyundai for violating the Robinson-Patman Act and the New York Dealer Act.  (*Id.* ¶¶ 56–58.)  On December 15, 2010, Giuffre Hyundai and Hyundai agreed

in writing to settle these advertising subsidy claims (the "Advertising Settlement Agreement").[3]

(*Id.* ¶ 60; Exs. 2–4, annexed to Decl. of Marcus Kim Bucci ("Bucci Decl."), Docket Entry No.

26-2.)  Hyundai paid Giuffre Hyundai $600,000 (the "Settlement Funds").  (Am. Compl. ¶ 58.)

The parties agreed in the Advertising Settlement Agreement that the Settlement Funds "were

subject to reversal if the Hyundai Franchise Agreement were to be terminated."  (*Id.* ¶ 63.)

     In December of 2012, two years after they entered into the Advertising Settlement

Agreement, Hyundai served Giuffre Hyundai with a notice of termination of the Hyundai

Franchise Agreement, to become effective as of March of 2013.  (*Id.* ¶ 64.)  As a result of the

---

[3]  Defendants attached to their motion three documents that they contend comprise the Advertising Settlement Agreement, consisting of (1) a letter agreement dated December 10, 2010, signed by Peter DiPersia, Hyundai's General Manager, and John Giuffre on behalf of Giuffre Hyundai, (2) a release dated December 15, 2010, signed by John Giuffre on behalf of Giuffre Hyundai, and (3) a letter dated August 14, 2009, from Giuffre Hyundai's counsel to Hyundai's counsel.  (Exs. 2–4, annexed to Bucci Decl.)  Plaintiffs do not dispute the authenticity of these documents nor do they dispute that these documents together comprise the Advertising Settlement Agreement.  Moreover, in asserting their claims regarding the advertising subsidies, Plaintiffs rely extensively on the Advertising Settlement Agreement and repeatedly refer to its terms in the Amended Complaint.  (Am. Compl. ¶¶ 58–63.)  Because Plaintiffs' advertising subsidies claims against Hyundai rely on the terms of the Advertising Settlement Agreement and because Plaintiffs repeatedly rely on the Advertising Settlement Agreement in the Amended Complaint, the Advertising Settlement Agreement is integral to, and incorporated by reference into, the Amended Complaint.  *See Wilson v. Kellogg Co.*, 628 F. App'x 59, 60 (2d Cir. 2016) ("In determining the adequacy of a claim under Rule 12(b)(6), consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." (quoting *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir. 1991))); *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) ("A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'" (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002))); *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (stating that where a plaintiff relies on the terms and effects of a document in drafting the complaint, the document is integral to the complaint); *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 123 (S.D.N.Y. 2010) ("To be incorporated by reference, the complaint must make 'a clear, definite and substantial reference to the documents.'" (quoting *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003))).

termination of the Hyundai Franchise Agreement, Hyundai "withdrew $600,000.00 from Giuffre Hyundai's open parts account" as repayment of the Settlement Funds. (*Id.* ¶ 67.)

### c. Termination of the Kia franchise agreement

On or about July 3, 2014, over a year after the termination of the Hyundai Franchise Agreement, Kia served Giuffre Kia with a notice of termination of the Kia Franchise Agreement, to become effective ninety days thereafter, on October 4, 2014 (the "Termination Notice"). (*Id.* ¶ 87.) Hyundai Capital subsequently notified Giuffre Kia that it would immediately terminate its "regularly ongoing financing" for the operation of Giuffre Kia's dealership and declare all debts owed to Hyundai Capital due on the effective date of the termination of Giuffre Kia's dealership. (*Id.* ¶¶ 96, 98.) According to Plaintiffs, Hyundai Capital's threatened actions would have had the practical effect of closing Giuffre Kia's dealership before the Termination Notice became effective. (*Id.* ¶ 97.)

### d. Settlement agreement with Hyundai Capital

Giuffre Kia did not challenge the Termination Notice pursuant to the New York Dealer Act. (*See id.* ¶ 100.) Instead, on or about July 30, 2014, Giuffre Kia entered into a settlement agreement with Hyundai Capital for debts owed to Hyundai Capital (the "Hyundai Capital Settlement Agreement"). (*Id.* ¶ 103.) Pursuant to the Hyundai Capital Settlement Agreement, Plaintiffs made an initial payment of $1,250,000 to Hyundai Capital and agreed to sell Giuffre Kia's dealership and to use the proceeds of the sale to satisfy the remaining debts owed to Hyundai Capital. (*Id.* ¶¶ 105, 108.) In exchange, Hyundai Capital agreed to forgo collection of Plaintiffs' debts while Plaintiffs attempted to sell Giuffre Kia's dealership. (*Id.* ¶ 105.) Hyundai Capital also agreed that if Plaintiffs successfully sold Giuffre Kia's dealership, Hyundai Capital would accept a "discounted amount" in satisfaction of the debts owed to it by Giuffre Kia and John Giuffre. (*Id.*) If, however, Plaintiffs failed to sell Giuffre Kia's dealership before an

agreed-upon deadline, Hyundai Capital would no longer be required to accept the discounted payment and could seek a judgment for the full amount owed to it by Giuffre Hyundai and John Giuffre.  (*Id.* ¶ 107.)

### e.  Sale agreement for Giuffre Kia's dealership

On or about September 12, 2014, Giuffre Kia agreed to sell its dealership to 1626 86th Street Auto LLC (the "Purchaser") and entered into an asset purchase agreement with the Purchaser (the "Sale Agreement").  (*Id.* ¶ 111.)  According to Plaintiffs, the Purchaser's principal, Joshua Aronson, was a "well-qualified buyer" and had previously operated both Kia and Hyundai dealerships.  (*Id.* ¶¶ 113–14.)  Giuffre Kia sent a copy of the Sale Agreement to Kia for its approval pursuant to the terms of the Kia Franchise Agreement.  (*Id.* ¶¶ 115–16.)  However, because Kia had already notified Giuffre Kia that it would terminate the Kia Franchise Agreement pursuant to the Termination Notice, Kia told Giuffre Kia that it was not required to review or consider the Sale Agreement.  (*Id.* ¶¶ 117–125.)

### f.  The interim settlement agreement

On October 1, 2014, Giuffre Kia, John Giuffre and Kia entered into an "interim settlement and extension agreement" (the "Interim Agreement").[4]  (*Id.* ¶ 122; Interim Agreement, Docket Entry No. 26-11.)  The Interim Agreement provides that "[e]xcept as expressly set forth herein, [Kia] has no obligation to review the [Sale Agreement]."  (Interim Agreement 2.)  Pursuant to the Interim Agreement, Kia extended the effective date of the

---

[4]  Defendants attached a copy of the Interim Agreement to their motion and Plaintiffs do not dispute the authenticity of the document.  In asserting their claims against Kia, Plaintiffs rely extensively on the Interim Agreement and repeatedly refer to its terms in the Amended Complaint.  (Am. Compl. ¶¶ 122–130.)  As explained with respect to the Advertising Settlement Agreement, because Plaintiffs' claims against Kia rely on the terms of the Interim Agreement and because Plaintiffs repeatedly rely on the Interim Agreement in the Amended Complaint, the Interim Agreement is integral to, and incorporated by reference into, the Amended Complaint. *See* footnote three *supra*.

Termination Notice for the termination of Giuffre Kia's franchise to December 4, 2014, and agreed to consider the Sale Agreement. (Am. Compl. ¶ 124.) For their part, Giuffre Kia and John Giuffre agreed that they would not challenge Kia's decision even if Kia declined to approve the Sale Agreement, (Interim Agreement 2). The Interim Agreement provides in pertinent part that:

> [I]n the event that [Kia] declines or otherwise fails to approve the [Sale Agreement] (a "Turndown"), the Dealership shall not file any claim, action, protest, proceeding or other challenge with respect to such Turndown (a "Claim"), including, but not limited to, any Claim asserting that the Turndown violates the [New York Dealer Act].

(*Id.*) The parties agreed that the Interim Agreement "contains the entire understanding of the parties hereto with respect to the subject matter described herein and supersedes all prior negotiations, representations or agreements between the parties relating to the subject matter hereof." (*Id.* at 3.) The Interim Agreement also specifies that it does not affect Giuffre Kia's right to contest the Termination Notice. (*Id.* at 1.)

### g.   Kia's refusal to approve the Sale Agreement

According to Plaintiffs, Kia required that the Purchaser have both sales and service facilities to operate the dealership prior to approving the Sale Agreement. (Am. Compl. ¶ 135.) To comply with this requirement, the Purchaser agreed to assume the lease to the location where Giuffre Kia then operated its sales facility, (*id.* ¶ 136), and entered into an agreement with an unspecified third party to purchase a property on which it could operate a service facility, (*id.* ¶ 138). Plaintiffs allege that the Purchaser had a thirty-day right to terminate the agreement to purchase a property to operate a service facility. (*Id.* ¶ 138–39). Plaintiffs contend that Kia contacted the Purchaser's principal and "made it clear" that Kia would not approve the Sale Agreement "under any circumstances." (*Id.* ¶ 140.) As a result of this communication, the

Purchaser exercised its right to terminate the agreement to purchase the property for a service facility.[5]  (*Id.* ¶ 146.)

On November 10, 2014, Kia notified Giuffre Kia that because the Purchaser did not have a service facility, it declined to approve the Sale Agreement.  (*Id.* ¶ 147.)  The Purchaser subsequently terminated the Sale Agreement.  (*Id.* ¶ 151.)

### h.  Giuffre Kia's inventory

After the termination of the Kia Franchise Agreement and Giuffre Kia's failure to sell its dealership, on or about December 3, 2015, Hyundai Capital sought and obtained six judgments against Plaintiffs totaling $8,999,376 from the New York Supreme Court, Kings County.  (*Id.* ¶ 31.)  These judgments represent the debts Plaintiffs owed to Hyundai Capital.  (*Id.* ¶ 32.)  To satisfy these judgments, Hyundai Capital repossessed Giuffre Kia's remaining vehicles and parts (the "remaining inventory") and sold the remaining inventory to Kia.  (*Id.* ¶¶ 269–70.)  Plaintiffs allege that Hyundai Capital and Kia had agreed that, in the event Hyundai Capital repossessed vehicle and parts from Kia dealerships, Kia would pay Hyundai Capital the same price that Kia's franchisees paid for the vehicles and parts.  (*Id.* ¶ 273.)  Plaintiffs also allege that Kia "exerted its influence over Hyundai Capital for Hyundai Capital to accept less than Giuffre Kia's purchase price" for the remaining inventory, resulting in Kia purchasing the remaining inventory from Hyundai Capital for a price that was less than what Giuffre Kia originally paid to acquire the remaining inventory.  (*Id.* ¶¶ 274, 276.)  After crediting Plaintiffs for the money Hyundai Capital received from its sale of the remaining inventory, Plaintiffs owe Hyundai Capital approximately $2,340,000.  (*Id.* ¶ 32.)

---

[5]  Plaintiffs allege that Giuffre Kia did not learn about this communication until on or about December 20, 2014.  (*Id.* ¶ 152–53.)

## II. Discussion

### a. Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)); *see also Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 320 (2d Cir. 2009)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson*, 631 F.3d at 63 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013). Although all allegations contained in the complaint are assumed true, this principle is "inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

### b. Claims against Hyundai for price discrimination

In the Amended Complaint, Plaintiffs assert that Hyundai engaged in price discrimination in order to favor Giuffre Hyundai's competitors by providing advertising subsidies to competing Hyundai dealerships, in violation of the Robinson–Patman Act and the New York Dealer Act. (Am. Compl. ¶¶ 53–79.) Plaintiffs allege that Hyundai's withdrawal of the Settlement Funds was "wrongful[]" and that they are entitled to recover the Settlement Funds because Hyundai's revocation of the Settlement Funds "ripened" Plaintiffs' claims under the Robinson–Patman Act

and the New York Dealer Act for Hyundai's advertising subsidies. (*Id.* ¶¶ 67–70.) Hyundai

argues that Giuffre Hyundai's claims are time-barred by the relevant statute of limitations. (Kia

and Hyundai Mem. of Law in Supp. of Defs. Mot. ("Defs. Mem.") 6, Docket Entry No. 26-1.)

Hyundai also argues that these claims were the subject of the Advertising Settlement Agreement

and are therefore barred by Giuffre Hyundai's release and discharge of those claims in the

Advertising Settlement Agreement.[6] (*Id.* at 5–6.)

### i. Plaintiffs' price-discrimination claims are time-barred

Claims under the Robinson–Patman Act are governed by a four-year statute of

limitations. *See* 15 U.S.C. § 15b (providing a four-year limitations period for antitrust claims);

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (noting that antitrust claims

are governed by a four-year statute of limitations); *Ambook Enterprises v. Time Inc.*, 612 F.2d

604, 608 & n.5 (2d Cir. 1979) (noting that the four-year limitations period for antitrust claims

provided by 15 U.S.C. § 15b governs claims under the Robinson–Patman Act); *Maddaloni*

*Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, No. 02-CV-6438, 2003 WL 21507529, at *3 (S.D.N.Y.

June 30, 2003) ("The statute of limitations applicable to violations of the Robinson–Patman Act

is four years." (first citing 15 U.S.C. § 15b; and then citing *Zenith Radio*, 401 U.S. at 338));

*Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia*, 23 F. Supp. 2d 439, 453 n.12

(S.D.N.Y. 1998) (stating that a four-year statute of limitations applies to claims under the

Robinson–Patman Act and noting that antitrust claims are governed by the limitations period

provided by 15 U.S.C. § 15b); *see also Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436

(2d Cir. 2005) (noting that a "four-year statute of limitations appli[es] to antitrust actions" (citing

---

[6] Plaintiffs do not to submit any arguments in opposition to Hyundai's motion to dismiss these claims and instead "rel[y] upon the pleadings in the [A]mended [C]omplaint." (Pls. Mem. of Law in Opp'n to Defs. Mot. ("Pls. Opp'n") 26, Docket Entry No. 27-6.)

15 U.S.C. § 15b)).  Claims under the Robinson–Patman Act accrue "when a defendant commits an act that injures a plaintiff's business."  *Zenith Radio*, 401 U.S. at 338; *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 328 F. App'x 695, 698 (2d Cir. 2009) (quoting *Zenith Radio*, 401 U.S. at 338); *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 276 (S.D.N.Y. 2015) (quoting *Zenith Radio*, 401 U.S. at 338).

Although the relevant provision of the New York Dealer Act does not include a statute of limitations, New York law provides a three-year statute of limitations for liabilities imposed by New York statutes.[7]  N.Y. C.P.L.R. § 214(2) (providing that "an action to recover upon a liability, penalty or forfeiture created or imposed by statute" must be commenced within three years).  Thus, claims under the New York Dealer Act are governed by a three-year statute of limitations.  *See Gray v. Toyota Motor Sales, U.S.A., Inc.*, 806 F. Supp. 2d 619, 626 (E.D.N.Y. 2011) (holding that because the New York Dealer Act does not contain a statute of limitations, New York Dealer Act claims are governed by the three-year statute of limitations established by section 214(2) of the N.Y. C.P.L.R. (first citing N.Y. C.P.L.R. § 214(2); and then citing *Gaidon v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201, 208 (2001))); *Bayridge Volvo Am., Inc. v. Volvo Cars of N. Am., Inc.*, No. 01-CV-1890, 2007 WL 541692, at *1 n.2 (S.D.N.Y. Feb. 21, 2007) (holding that a three-year statute of limitations applies to New York Dealer Act claims).  Under New York law, "a cause of action accrues, triggering commencement of the limitations period, when all of the factual circumstances necessary to establish a right of action have occurred, so that the plaintiff would be entitled to relief."  *Gaidon*, 96 N.Y.2d at 210 (collecting cases); *Kainer v. Christie's*

---

[7]  Because Plaintiffs fail to specify which section of the New York Dealer Act they rely on, the Court construes Plaintiffs' claim as alleging a violation of sections 463(2)(g) and 463(2)(aa), which prohibit franchisors from engaging in price discrimination.  *See* N.Y. Veh. & Traf. Law § 463(2)(g), (aa).

*Inc.*, 34 N.Y.S.3d 58, 60 (App. Div. 2016) (quoting *Gaidon*, 96 N.Y.2d at 210).

According to the allegations in the Amended Complaint, Hyundai engaged in price discrimination in 2010 in violation of the Robinson–Patman Act and the New York Dealer Act. (Am. Compl. ¶¶ 54–60.) Plaintiffs commenced this action on March 12, 2015, more than four years after the alleged price discrimination. (Notice of Removal ¶ 1.) Plaintiffs' claims against Hyundai are therefore time-barred.[8]

### ii. Plaintiffs' price-discrimination claims are barred by the Advertising Settlement Agreement

Even if timely, Plaintiffs' price-discrimination claims against Hyundai would be barred by Plaintiffs' release of the claims in the Advertising Settlement Agreement. In the Amended Complaint, Plaintiffs allege that Hyundai's withdrawal of the Settlement Funds was "wrongful[]" and that Plaintiffs are entitled to recover the Settlement Funds because Hyundai's revocation of the Settlement Funds "ripened" Plaintiffs claims under the Robinson–Patman Act and the New York Dealer Act for Hyundai's advertising subsidies. (Am. Compl. ¶¶ 67–70.)

---

[8] Broadly construing Plaintiffs' allegations in the Amended Complaint as alleging that the price-discrimination claims did not accrue until Hyundai's withdrawal of the Settlement Funds from their account in December of 2012, or that the statute of limitations should otherwise be tolled, the Court nevertheless grants Defendants' motion to dismiss these claims. As noted in footnote six, *supra*, Plaintiffs have not made any arguments in opposition to Hyundai's motion to dismiss these claims. Thus, Plaintiffs have not provided any legal support that the claim accrual date was delayed until 2012 when Hyundai recouped the Settlement Funds. Nor have Plaintiffs alleged any facts that could arguably support equitable tolling of the statute of limitations. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012) ("Under federal common law, a statute of limitations may be tolled due to the defendant's fraudulent concealment if the plaintiff establishes that: (1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's 'discovery of the nature of the claim within the limitations period'; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." (quoting *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 543 (2d Cir. 1999))); *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007) ("Under New York law, the doctrines of equitable tolling or equitable estoppel 'may be invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action.'" (quoting *Doe v. Holy See (State of Vatican City)*, 793 N.Y.S.2d 565, 568 (App. Div. 2005))).

"A settlement agreement is a contract that is interpreted according to general principles of contract law." *Powell v. Omnicom*, 497 F.3d 124, 128 (2d Cir. 2007) (citing *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005)); *see also In re Motors Liquidation Co.*, 578 F. App'x 43, 44 (2d Cir. 2014) ("It is well established that '[s]ettlement agreements are contracts and must therefore be construed according to general principles of contract law.'" (alteration in original) (quoting *Collins v. Harrison–Bode*, 303 F.3d 429, 433 (2d Cir. 2002))).  "[A] valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011) (quoting *Glob. Minerals & Metals Corp. v. Holme*, 824 N.Y.S.2d 210, 214 (App. Div. 2006)); *see also Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011) ("Under New York law . . . , 'a valid release constitutes a complete bar to an action on a claim which is the subject of the release.'" (quoting *Centro Empresarial Cempresa*, 17 N.Y.3d at 276)).  "If the language of a release is clear and unambiguous, the signing of a release is a jural act binding on the parties." *Centro Empresarial Cempresa*, 17 N.Y.3d at 276 (internal quotation marks omitted) (quoting *Booth v. 3669 Delaware*, 92 N.Y.2d 934, 935 (1998)); *Rudovic v. Rudovic*, 16 N.Y.S.3d 856, 859 (App. Div. 2015) (quoting *Booth*, 92 N.Y.2d at 935)); *see also Powell*, 497 F.3d at 128 ("Once entered into, the contract is binding and conclusive." (citing *Janneh v. GAF Corp.*, 887 F.2d 432, 436 (2d Cir. 1989))).  "A release may be invalidated, however, for any of 'the traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake.'" *Centro Empresarial Cempresa*, 17 N.Y.3d at 276 (quoting *Mangini v. McClurg*, 24 N.Y.2d 556, 563 (1969)); *Pacheco v. 32–42 55th St. Realty, LLC*, 33 N.Y.S.3d 301, 302 (App. Div. 2016) (quoting *Centro Empresarial Cempresa*, 17 N.Y.3d at 276).

Plaintiffs do not allege that the Advertising Settlement Agreement is invalid or is not a complete release of the price-discrimination claims, or that Defendants breached the Advertising Settlement Agreement. Plaintiffs instead allege that the Advertising Settlement Agreement "makes no reference to the advertising discrimination claims," (Am. Compl. ¶ 61), suggesting that the Advertising Settlement Agreement does not address the price-discrimination claims. However, in other parts of the Amended Complaint, Plaintiffs allege that the parties entered into the Advertising Settlement Agreement to settle the "threatened lawsuit" regarding the advertising subsidies, and that "the settlement funds [were] paid for the wrongful advertising subsidies." (*Id.* ¶¶ 58, 69.) Moreover, the second of the three documents that comprise the Advertising Settlement Agreement is entitled "Release" and states that Giuffre Hyundai and John Giuffre release any claims against Hyundai related to "the allegations referenced in the letter dated August 14, 2009." (Ex. 3, annexed to Bucci Decl.) In the August 14, 2009 letter, the third of the three documents that comprise the Advertising Settlement Agreement, Plaintiffs' counsel accuses Hyundai of providing advertising subsidies to competing dealerships. (Ex. 4, annexed to Bucci Decl.) Based on Plaintiffs' own allegations in the Amended Complaint and the clear and unambiguous language of the Advertising Settlement Agreement, the Advertising Settlement Agreement is a complete release of Plaintiffs' price-discrimination claims. Plaintiffs' price-discrimination claims are therefore barred by the Advertising Settlement Agreement.[9]

---

[9] Furthermore, Plaintiffs' price-discrimination claims appear to be without merit. Plaintiffs allege in the Amended Complaint that Hyundai had a right to recoup the Settlement Funds if the Hyundai Franchise Agreement was terminated. (Am. Compl. ¶ 63.) Plaintiffs also allege that on or about December of 2012, Hyundai terminated the Hyundai Franchise Agreement. (*Id.* ¶¶ 64, 66.) Thus, Plaintiffs' own pleadings suggest that Hyundai was entitled to recoup the $600,000.

Accordingly, the Court grants Hyundai's motion to dismiss Plaintiffs' price-discrimination claims.

### c. Claims against Kia

Kia argues that the Court should dismiss all claims against it because (1) Plaintiffs' claims that are based on Kia's refusal to approve the Sale Agreement are barred by the Interim Agreement and are without merit,[10] and (2) Plaintiffs' claim as to the remaining inventory is without merit.[11]

### i. Claims based on Kia's refusal to approve the Sale Agreement

Kia contends that Plaintiffs' claims based on its refusal to approve the Sale Agreement are barred by the Interim Agreement which is a valid, bargained-for settlement agreement, and which Giuffre Kia and John Giuffre entered into voluntarily and without coercion. (Defs. Mem. 10–12.) Kia specifically argues that because Giuffre Kia and John Giuffre agreed that "in the event that [Kia] declines or otherwise fails to approve the [Sale Agreement]" they "shall not file any claim, action, protest, proceeding or other challenge with respect to" Kia's refusal to approve the Sale Agreement, (Interim Agreement 2), they are barred from bringing these claims. (*Id.* at 12.)

---

[10] Plaintiffs' claims that are based on Kia's refusal to approve the Sale Agreement are: unreasonably withholding consent to the sale of Giuffre Kia's motor vehicle dealership in violation of the New York Dealer Act and the California Vehicle Code; imposing a contractual term that is contrary to public policy in violation of the California Civil Code; imposing unreasonable restrictions on the sale of Giuffre Kia's motor vehicle dealership in violation of the New York Dealer Act and the California Vehicle Code; failure to comply with the terms of its franchise agreement in good faith in violation of the ADDCA, fraudulent inducement; tortious interference with contract; and breach of the implied covenant of good faith and faith dealing. (Am. Compl. ¶¶ 80–267, 293–296.)

[11] Plaintiffs' claim as to the remaining inventory is that Kia failed to repurchase the remaining inventory at fair and reasonable compensation in violation of the New York Dealer Act. (Am. Compl. ¶¶ 268–81.)

Plaintiffs make three challenges to the validity of the Interim Agreement. Plaintiffs argue that (1) the Interim Agreement is not a settlement agreement because it did not resolve the "actual controversy," of whether the Termination Notice was properly issued, (2) the Interim Agreement is not a valid contract because Kia fraudulently induced Giuffre Kia and John Giuffre to agree to the Interim Agreement, and (3) the Interim Agreement is not a valid contract because Plaintiffs received no consideration for agreeing to the Interim Agreement. (Pls. Opp'n 12–14.) As explained below, the Court rejects Plaintiffs' challenges to the Interim Agreement. However, before addressing Plaintiffs' challenges, the Court addresses two preliminary issues: (1) whether the Interim Agreement supersedes the Kia Franchise Agreement as to these issues and (2) the applicable choice of law.

The parties disagree over whether California or New York law should govern the interpretation of the Kia Franchise Agreement,[12] (Pls. Opp'n 16; Defs. Mem. 14–15), but they have not addressed which state law governs the Interim Agreement. As explained below, the Court finds that the Interim Agreement is the relevant document for deciding these claims.

### 1. The Interim Agreement supersedes the Kia Franchise Agreement

Plaintiffs allege that the purpose of entering into the Interim Agreement was for Kia to extend the termination date and to review the Sale Agreement. (Am. Compl. ¶ 123.) The

---

[12] Plaintiffs allege in the Amended Complaint that the Kia Franchise Agreement is "governed by and construed according to California substantive law (and not California choice of law rules)." (Am. Compl. ¶ 173.) Plaintiffs argue that although section 463(2)(t) of the New York Dealer Act prohibits a franchisor from imposing the law of another state on a franchisee, it permits a dealership to "take advantage of" non-New York law "if it is of greater benefit than the protections afforded under the laws of New York." (Pls. Opp'n 16.) Kia argues that because section 463(2)(t) of the New York Dealer Act makes it unlawful for a franchisor "to require by the terms of the franchise that any dispute . . . in any way related to the franchise be determined through the application of any other state's laws," the choice-of-law provision in the Kia Franchise Agreement is invalid and New York law governs this dispute. (Defs. Mem. 14–15.)

Interim Agreement states that the parties entered into the agreement following settlement negotiations regarding their disagreements with respect to the Termination Notice and the Sale Agreement. (Interim Agreement 1.) According to the Interim Agreement, after issuing the Termination Notice, Kia insisted that it had no obligation to consider the Sale Agreement. (*Id.*) In exchange for Kia agreeing to extend the termination date from October 4, 2014, to December 4, 2014, and also agreeing to consider the Sale Agreement, Plaintiffs agreed not to challenge Kia's decision if it refused to approve the Sale Agreement. (*Id.* at 1–2.) The Interim Agreement specifically states that it "contains the entire understanding of the parties hereto with respect to the subject matter described herein and supersedes all prior negotiations, representations or agreements between the parties relating to the subject matter hereof." (Interim Agreement 3.) The Interim Agreement was executed by Kia, Giuffre Kia and John Giuffre, eight years after the execution of the Kia Franchise Agreement. (*See id.* at 3–4; Am. Compl. ¶ 41.) Based on its unambiguous terms, the Interim Agreement superseded the Kia Franchise Agreement with respect to Kia's obligation to consider the Sale Agreement and Plaintiffs' agreement to surrender any right they had to challenge Kia's decision regarding the Sale Agreement by releasing those rights. Thus, the Court finds that the Interim Agreement is the operative document governing Plaintiffs' claims against Kia based on Kia's refusal to approve the Sale Agreement.

Because the Interim Agreement does not contain a choice-of-law provision, the Court conducts a choice-of-law analysis.

### 2. Choice-of-law analysis

Where, as here, jurisdiction is based on diversity and the presence of a federal question, courts apply the choice of law rules of the forum state. *Totalplan Corp. of Am. v. Colborne*, 14 F.3d 824, 832 (2d Cir. 1994) ("Because jurisdiction in this case is based on diversity of

citizenship as well as the presence of a federal question, we follow the choice of law rules of New York, the forum state." (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941)); *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989) ("A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state." (first citing *Klaxon*, 313 U.S. at 496; and then citing *Colgate Palmolive Co. v. S/S Dart Canada*, 724 F.2d 313, 316 (2d Cir. 1983))); *see also Duffey v. Twentieth Century Fox Film Corp.*, 14 F. Supp. 3d 120, 128–29 (S.D.N.Y. 2014) (applying New York choice of law principles to contract interpretation and noting that "[f]ederal courts faced with state law claims must apply choice-of-law principles of the state in which they sit" regardless of whether jurisdiction is based on diversity or federal question).

In contract cases, "New York applies the 'center of gravity' or 'grouping of contacts' choice of law theory." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 641 (2d Cir. 2016) (alteration and internal quotation marks omitted) (citing *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 226 (1993)); *see also Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 583 (2d Cir. 2006) ("The New York Court of Appeals has held, in contract cases, that the 'center of gravity' or 'grouping of contacts' analysis is to be applied in choice of law situations." (citing *Stolarz*, 81 N.Y.2d at 226)). This analysis directs Federal courts to consider a "spectrum of significant contacts rather than a single possibly fortuitous event," and in particular, the "New York Court of Appeals has endorsed the following factors . . . : the places of negotiation and performance; the location of the subject matter; and the domicile or place of business of the contracting parties." *Fireman's Fund*, 822 F.3d at 642 (internal quotation marks omitted) (first quoting *Stolarz*, N.Y.2d at 226; and then quoting *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 151–52 (2d Cir. 2008)): *see also Beth Israel*

*Med. Ctr.*, 448 F.3d at 583 (listing the same factors (citing *Stolarz*, N.Y.2d at 227)).

In applying these factors to the facts in the instant case, the Court concludes that the "grouping of contacts" weigh in favor of applying New York law. While Kia is a California corporation, (Am. Compl. ¶ 5), Giuffre Kia is a New York limited liability company, (*id.* ¶ 2), and John Giuffre, is a New York citizen, (*id.* ¶ 4). In addition, Giuffre Kia's dealership, the subject of the Interim Agreement, was located in Brooklyn, New York at all relevant times.[13] (*Id.* ¶ 41.) The Court therefore applies New York law. *See Certified Multi-media Sols., Ltd. v. Preferred Contractors Ins. Co. Risk Retention Grp., LLC*, 150 F. Supp. 3d 228, 239 (E.D.N.Y. 2015) (finding that New York law applied to contract claim because the plaintiff was a New York corporation and the underlying actions occurred in New York); *Duffey v. Twentieth Century Fox Film Corp.*, 14 F. Supp. 3d 120, 130 (S.D.N.Y. 2014) (applying New York choice of law rules to contract claim and finding that "Texas is clearly the center of gravity" because "[t]he contract was negotiated, executed, and performed in Texas").

Having decided that the Interim Agreement governs Plaintiffs' claims about the Sale Agreement and that New York law should be applied, the Court considers Plaintiffs' three challenges to the validity of the Interim Agreement.

### 3. Plaintiffs' challenges to the Interim Agreement

### A. The Interim Agreement is a settlement

Plaintiffs contend that because the Interim Agreement did not resolve the parties' dispute regarding "whether or not the [Termination Notice] was properly issued," the Interim Agreement

---

[13] Moreover, the Interim Agreement twice references New York law, with regard to Kia's obligation "under New York law to consider or approve the [Sale Agreement]" and with regard to the agreement by Giuffre Kia and John Giuffre that they would not challenge Kia's decision to decline to approve the Sale Agreement by asserting that the rejection of the Sale Agreement "violates the New York Franchised Motor Vehicle Dealer Act." (Interim Agreement 1–2)

is not a settlement. (Pls. Opp'n 12–13.) Plaintiffs argue that the intention of the parties in agreeing to the Interim Agreement was that "each party could perform under the [Interim Agreement] without resulting in any resolution of the controversy between the parties." (*Id.* at 13.) Plaintiffs further argue that if Kia had approved the Sale Agreement, the parties would have then entered into a settlement agreement. (*Id.*) Kia argues that the terms of the Interim Agreement demonstrates that it "is a valid settlement agreement," between Kia, Giuffre Kia and John Giuffre, even though it did not resolve all of the possible claims between the parties. (Kia and Hyundai Reply Mem. of Law in Supp. of Defs. Mot. ("Defs. Reply") 6, Docket Entry No. 28.)

"A settlement agreement is a contract that is interpreted according to general principles of contract law." *Powell*, 497 F.3d at 128); *see also In re Motors Liquidation*, 578 F. App'x at 44 ("It is well established that settlement agreements are contracts and must therefore be construed according to general principles of contract law." (alteration, citation and internal quotation marks omitted)). Thus, when interpreting a settlement, a court "must effectuate the parties' intent." *Bethea v. Thousand*, 6 N.Y.S.3d 584, 586 (App. Div. 2015) (quoting *Alshawhati v. Zandani*, 918 N.Y.S.2d 173, 175 (App. Div. 2011)); *see also Am. Bridge Co. v. Acceptance Ins. Co.*, 858 N.Y.S.2d 261, 263 (2008) (stating that courts have the "responsibility of effectuating the true intent of the parties" when interpreting a settlement (collecting cases)). "As with any contract," if the terms of a settlement are unambiguous, a court "must give effect to the parties' intent based upon the plain meaning of the words used by the parties." *Klein v. Klein*, 22 N.Y.S.3d 547, 549 (N.Y. App. Div. 2015) (quoting *Stein v. Stein*, 12 N.Y.S.3d 284, 286 (App. Div. 2015)); *Long Island Junior Soccer League v. Back of Net, Ltd.*, 925 N.Y.S.2d 555, 556 (App. Div. 2011) (same (quoting *Alshawhati*, 918 N.Y.S.2d at 175)).

Prior to agreeing to the Interim Agreement, Plaintiffs were "negotiating with [Kia] concerning a resolution of [the Termination Notice]," (Am. Compl. ¶ 110), as Plaintiffs "did not believe that there was a proper basis for the termination," (*id.* ¶ 100). In an effort to resolve the dispute regarding the Termination Notice, Plaintiffs proposed selling Giuffre Kia's dealership to the Purchaser and submitting the Sale Agreement to Kia for its approval. (*Id.* ¶¶ 111, 115–16.) Kia refused to consider the Sale Agreement, taking the position that because of the Termination Notice, Giuffre Kia did not have the right to sell the dealership. (*Id.* ¶ 125; Interim Agreement 2.) Plaintiffs challenged Kia's claim that Giuffre Kia could not sell its dealership because of the Termination Notice. (Am. Compl. ¶ 126.) Plaintiffs argued to Kia that under the New York Dealer Act and the terms of the Kia Franchise Agreement, Kia had an obligation to review the Sale Agreement, despite the pending termination of the Kia Franchise Agreement. (Am. Compl. ¶¶ 117–18.)

To resolve the dispute regarding Kia's obligation to consider the Sale Agreement, the parties entered into the Interim Agreement. (*Id.* ¶¶ 122 (stating that the parties entered into the Interim Agreement following negotiations regarding the Sale Agreement).) Kia agreed to extend the date of termination and to review the Sale Agreement. (*Id.* ¶ 123.) The Interim Agreement specifies that it is "a valid settlement agreement," which was the result of "settlement discussions" between the parties, in which Kia agreed to review the Sale Agreement, notwithstanding its position that it had no obligation to do so, and Giuffre Kia and John Giuffre agreed not to challenge any refusal by Kia to approve the Sale Agreement. (Interim Agreement 1–2.) The Interim Agreement also preserved Giuffre Kia's right to challenge the Termination Notice. (*Id.* at 1.)

The plain language of the Interim Agreement demonstrates that the parties settled their dispute as to Kia's obligation to consider the Sale Agreement despite the Termination Notice, but did not settle their dispute as to the validity of the Termination Notice since the Interim Agreement specifically preserved Giuffre Kia's right to subsequently challenge the Termination Notice. *See Klein*, 22 N.Y.S.3d at 549 (stating that where the terms of a settlement are unambiguous, the intent of the parties must be ascertained from the plain language of the agreement). Plaintiffs' argument that "the actual controversy" between the parties "was whether or not the [Termination Notice] was properly issued," (Pls. Opp'n 12–13), is belied by the terms of the Interim Agreement. Thus, based on the terms of the Interim Agreement, the Court finds that the Interim Agreement is a settlement of Plaintiffs' claims as to Kia's decision to accept or reject the Sale Agreement.

### B. Plaintiffs were not fraudulently induced to enter the Interim Agreement

Plaintiffs contend that because Kia "never had any intention to review the [Sale Agreement] in good faith and never had an intention to approve the [Sale Agreement] even if the Purchaser was qualified," the Interim Agreement is invalid because Kia fraudulently induced Giuffre Kia and John Giuffre to agree to the Interim Agreement. (Pls. Opp'n 13, 18–19.) Kia correctly argues that "a fraud claim cannot be based on defendant's alleged misrepresentation of its intention to perform its contractual promises." (Defs. Reply 5 n.2.)

Under New York law, a party may invalidate a contract by satisfying the elements of a fraudulent inducement claim. *See Maxam v. Kucharczyk*, 29 N.Y.S.3d 683, 685 (App. Div. 2016) (finding that the plaintiff failed to establish that the contract was invalid because she failed to state a cause of action for fraudulent inducement); *see also Citigroup Glob. Markets, Inc. v. KLCC Investments, LLC*, No. 06-CV-5466, 2015 WL 5853916, at *9 (S.D.N.Y. Sept. 28, 2015)

(stating that under New York law a party may void a contract by stating a fraudulent inducement claim (citing *Dalessio v. Kressler*, 773 N.Y.S.2d 434, 437 (App. Div. 2004))). However, an allegation of fraudulent inducement "may not be used as a means of restating what is, in substance, a claim for breach of contract," and "general allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support a fraud claim." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) (internal quotation marks omitted) (quoting *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995))); *see also Kearins v. Panalpina, Inc.*, 570 F. App'x 9, 12 (2d Cir. 2014) (same (quoting *Wall*, 471 F.3d at 416)); *Enzo Biochem, Inc. v. PerkinElmer, Inc.*, No. 03-CV-3817, 2013 WL 5943987, at *5 (S.D.N.Y. Oct. 28, 2013) ("[A] claim for fraudulent inducement does not arise simply because a party entered into a contract while simultaneously intending to breach it." (citing *767 Third Ave. LLC v. Greble & Finger, LLP*, 778 N.Y.S.2d 157, 158 (App. Div. 2004))). In order to establish fraudulent inducement based "upon an insincere promise of future performance," the allegedly false promise must be "collateral to the contract" and cannot "concern[]the performance of the contract itself." *Fairway Prime Estate Mgmt., LLC v. First Am. Int'l Bank*, 952 N.Y.S.2d 524, 527 (App. Div. 2012) (quoting *HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59, 74 (App. Div. 2012); *see also Wall*, 471 F.3d at 416 (noting that fraudulent inducement may be based on a promise "not contained in the written agreement," which was made with an intention not to perform (citing *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986))).

Plaintiffs argue that Kia fraudulently induced Giuffre Kia and John Giuffre to agree to the Interim Agreement because Kia never intended to review the Sale Agreement in good faith as it was obligated to do under the Interim Agreement. (Pls. Opp'n 13, 18–19.) Because Plaintiffs cannot assert a fraudulent inducement defense based on an allegation that Kia did not intend to

perform its contractual obligations, Plaintiffs cannot invalidate the Interim Agreement based on this defense. *See Wall*, 471 F.3d at 416.

### C. Plaintiffs have not shown a lack of consideration

Plaintiffs contend that the Interim Agreement is not a valid agreement because "Giuffre Kia received no consideration for the waiver" of its right to challenge Kia's decision to decline to approve the Sale Agreement. (Pls. Opp'n 13.) In support of this claim, Plaintiffs argue that the only consideration Giuffre Kia received was a two-month extension of the termination date of the Kia Franchise Agreement, and further argue that Giuffre Kia could have received a longer extension of the termination date if it had challenged the Termination Notice. (*Id.* at 13–14.) Plaintiffs contend that, because Giuffre Kia could have received a longer extension of the termination date by challenging the Termination Notice without waiving its right to challenge Kia's decision to decline to approve the Sale Agreement, Giuffre Kia "received nothing in return for the waiver." (*Id.*) Plaintiffs also argue that Giuffre Kia did not receive a promise from Kia to review the Sale Agreement in good faith. (*Id.* at 14.) Kia has not responded to this argument.

In New York state, "[t]he law is well settled that in order for a promise to be enforceable as a contract, the promise must be supported by valid consideration. Consideration is defined as either a bargained for gain or advantage to the promisee or a bargained for legal detriment or disadvantage to the promisor." *Greenberg v. Greenberg*, 646 F. App'x 31, 31, (2d Cir. 2016) (quoting *Startech, Inc. v. VSA Arts*, 126 F. Supp. 2d 234, 236–37 (S.D.N.Y. 2000)); *see also Beitner v. Becker*, 824 N.Y.S.2d 155, 156 (2006) ("All contracts must be supported by consideration, consisting of a benefit to the promisor or a detriment to the promisee." (first citing *Holt v. Feigenbaum*, 52 N.Y.2d 291, 299 (1981); then citing *Weiner v. McGraw–Hill*, 57 N.Y.2d 458, 464 (1982); and then citing *Vil. of Upper Nyack v. Christian and Missionary Alliance*, 547 N.Y.S.2d 388 (App. Div. 1989)). "[T]raditional principles of contract law provide that parties are

free to make their bargain, even if the consideration exchanged is grossly unequal or of dubious value." *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 374 (2d Cir. 2000) (internal quotation marks omitted) (quoting *Apfel v. Prudential–Bache Sec.*, 81 N.Y.2d 470, 475 (1993))); *see also Coleman v. Sys. Dialing LLC*, No. 15-CV-3868, 2016 WL 3387748, at *3 (S.D.N.Y. June 17, 2016) ("Courts do not weigh the relative value of the consideration exchanged because '[u]nder the traditional principles of contract law, the parties to a contract are free to make their bargain, even if the consideration exchanged is grossly unequal or of dubious value.'" (alteration in original) (quoting *Apfel*, 81 N.Y.2d at 475)); *Moezinia v. Ashkenazi*, 26 N.Y.S.3d 192, 193 (App. Div. 2016) (Contracting parties "are free to make their bargain, 'even if the consideration exchanged is grossly unequal or of dubious value.'" (quoting *Apfel*, 81 N.Y.2d at 475)).  So long as a contracting party receives "something of value under [a] contract, the contract [will] not be void for lack of consideration." *Nadel*, 208 F.3d at 374 (internal quotation marks omitted) (quoting *Apfel*, 81 N.Y.2d at 476)); *see also Moezinia*, 26 N.Y.S.3d at 193 ("[A]bsent fraud or unconscionability, the adequacy of consideration is not a proper subject for judicial review.  It is enough that something of real value was exchanged . . . ." (citing *Apfel*, 81 N.Y.2d at 476)).

Plaintiffs' argument that the extension of the termination date was insufficient consideration is unpersuasive.  Even if Plaintiffs could have extended the termination date by challenging the Termination Notice, the Interim Agreement allowed Plaintiffs to extend the termination date without incurring the costs of litigating the Termination Notice, which is a bargained-for advantage.  *See Nadel*, 208 F.3d at 374 (stating that if a contracting party receives something of value under the contract, the contract is not void for lack of consideration (citing *Apfel*, 81 N.Y.2d at 476)); *Wood Realty Trust v. N. Storonske Cooperage Co.*, 646 N.Y.S.2d 410, 411 (App. Div. 1996) (stating that "a promise to forego future litigation can constitute valid

consideration" (citing *Williamsville Cent. Sch. Dist. v. New York State Urban Dev. Corp.*, 530 N.Y.S.2d 402, 403 (App. Div. 1988))). In addition, because Kia's position after serving the Termination Notice was that it had no obligation to consider the Sale Agreement, by agreeing in the Interim Agreement to consider the Sale Agreement, Plaintiffs received the advantage of not having to litigate whether Kia was required by the Kia Franchise Agreement to consider the Sale Agreement after serving the Termination Notice.

Based on the Court's finding that the Interim Agreement is a valid agreement pursuant to which Plaintiffs agreed to release all claims against Kia with regard to Kia's decision as to the Sale Agreement, the Court grants Defendant's motion to dismiss Plaintiffs' claims based on Kia's refusal to approve the Sale Agreement.[14]

### ii. Remaining inventory claim

Plaintiffs contend that following the termination of Giuffre Kia's dealership, Kia was required by section 463(2)(o) of the New York Dealer Act to purchase the remaining inventory for fair and reasonable value but failed to do so. (Pls. Opp'n 22.) Plaintiffs argue that instead of purchasing the remaining inventory for fair and reasonable value, Hyundai Capital repossessed the remaining inventory and sold it to Kia for less than fair and reasonable value. (*Id.* at 22–23.) Plaintiffs also argue that because Hyundai Capital is Kia's "captive finance source,"[15] Kia is responsible for Hyundai Capital selling the remaining inventory for less than fair and reasonable

---

[14] Because the Interim Agreement precludes Plaintiffs' claims related to Kia's rejection of the Sale Agreement, the Court declines to consider the merits of these claims.

[15] The New York Dealer Act defines "captive finance source" as "any finance source that provides automotive-related loans, or purchases retail installment contracts or lease contracts for motor vehicles and is, directly or indirectly, owned, operated or controlled, in whole or in part, by a manufacturer, factory branch, distributor or distributor branch." N.Y. Veh. & Traf. Law § 462(16). Defendants have not contested Plaintiffs' allegation that Hyundai Capital is Kia's captive finance source.

value pursuant to section 463(2)(u) of the New York Dealer Act, which prevents a franchisor from using a captive finance source to accomplish what would otherwise be unlawful conduct by the franchisor.  (*Id.* at 23.)

Kia contends that because Hyundai Capital, as a judgment creditor, repossessed the remaining inventory and sold the remaining inventory to Kia, section 463(2)(o) does not govern the sale because Giuffre Kia did not have any inventory that Kia was required to purchase pursuant to section 463(2)(o).  (Def. Mem. 21–23.)  Kia argues that while section 463(2)(o) mandates that the franchisor purchase the dealership's remaining vehicles and parts for fair and reasonable compensation, it does not require the franchisor to "purchase inventory seized from a dealer by a secured party."  (*Id.* at 21–22.)  Kia also argues that Plaintiffs' allegation that it "used" Hyundai Capital to accept less than fair and reasonable compensation for the remaining inventory is conclusory and belied by the fact that Kia and Hyundai Capital have "strongly conflicting interests."  (*Id.* at 23–24.)

Section 463(2)(o) of the New York Dealer Act provides in relevant part that it is unlawful for a franchisor to:

> (1) Upon a termination of a franchise by a franchisor or franchised motor vehicle dealer under this article, to refuse to accept a return of new and unused current model motor vehicle inventory which has been acquired from the franchisor, new and unused noncurrent model motor vehicle inventory which has been acquired from the franchisor within one hundred eighty days of the effective date of the termination; supplies, parts, equipment, signage, special tools, and furnishings purchased from the franchisor or its approved sources. . . .

> (2) The franchisor shall pay fair and reasonable compensation for the above described property upon repurchase. In the case of new motor vehicle inventory, accessories and parts, fair and reasonable compensation shall in no instance be less than the net acquisition price paid by the franchised motor vehicle dealer to the franchisor or its approved sources.

N.Y. Veh. & Traf. Law § 463(2)(o). Thus, on its face, the statute requires a franchisor to accept returns of new and unused inventory and to pay fair and reasonable compensation.[16]

The New York Dealer Act also prevents a franchisor from using a third-party source to engage in acts on behalf of the franchisor where the franchisor is prohibited from engaging in such act. Section 463(2)(u) of the New York Dealer Act provides, in relevant part, that it is unlawful for a franchisor "[t]o use any . . . captive finance source . . . to accomplish what would otherwise be unlawful conduct under [the New York Dealer Act] on the part of the franchisor." *Id.* § 463(2)(u); *see also Agar Truck Sales, Inc. v. Daimler Trucks N. Am., LLC*, No. 13-CV-5471, 2014 WL 1318383, at *5 (S.D.N.Y. April 1, 2014) (noting that section 463(2)(u) imposes liability on franchisors for the actions of their subsidiaries or captive finance sources); *Audi of Smithtown, Inc. v. Volkswagen of Am., Inc.*, 954 N.Y.S.2d 106, 108 (App. Div. 2012) (finding that the defendant franchisor's captive finance source had violated the New York Dealer Act by engaging in price discrimination between dealerships, and that although the defendant franchisor had not participated in the price-discrimination scheme directly, it was nevertheless liable pursuant to section 463(2)(u)).

Although section 463(2)(o) makes it unlawful for a franchisor, or a captive finance source

---

[16] Neither party has cited to any case law interpreting section 463(2)(o) and the Court only found one case. *See K & H Kawasaki Inc. v. Yamaha Motor Corp., U.S.A.*, No. 95-CV-1824, 1998 WL 236204, at *5 (N.D.N.Y. May 7, 1998) ("Neither party cited case law interpreting this section of the [New York] Act, and no court appears to have discussed it in any detail."). In *K & H Kawasaki*, the plaintiff franchisee presented evidence that the defendant franchisor coerced the plaintiff to purchase vehicles, wrongfully terminated the plaintiff's franchise and refused to purchase the remaining inventory unless the plaintiff agreed to waive any claims regarding the purchase of the remaining inventory, which the plaintiff refused to do. *Id.* at 3–5. The court denied the defendant's motion for summary judgment as to the plaintiff's section 463(2)(o) claim because it determined that a reasonable juror could find that the defendant franchisor lacked a good-faith reason to require the plaintiff to release its claims against the franchisor for the repurchase of the inventory in exchange for purchasing the plaintiff's remaining inventory. *Id.* at 5.

pursuant to section 463(2)(u), to refuse to purchase any returned inventory for less than fair and reasonable value, by its terms, section 463(2)(o) does not impose a duty on a judgment creditor that has repossessed a franchisee's remaining inventory.  *See* N.Y. Veh. & Traf. Law § 463(2)(o)(1)–(2) (providing that a franchisor may not "refuse to accept a return of" a terminated franchisee's inventory and must pay fair and reasonable compensation when repurchasing the inventory).  Nor do sections 463(2)(o) and 463(2)(u) on their face regulate the conduct of a judgment creditor disposing of property it has repossessed.  *See id.* § 463(2)(o), 463(2)(u).

Plaintiffs allege in the Amended Complaint that Hyundai Capital repossessed the remaining inventory to satisfy outstanding judgments against Plaintiffs.  (Am. Compl. ¶¶ 269–71.)  Based on these allegations, section 463(2)(o) is not implicated as Hyundai Capital was not accepting returns from Giuffre Kia when it repossessed the remaining inventory to satisfy its judgments; rather Hyundai Capital was acting like any other creditor with a judgment when it repossessed the remaining inventory.  *See Wecker v. Crossland Grp., Inc.*, 939 N.Y.S.2d 481, 483 (App. Div. 2012) (noting that creditors have a right under New York law to repossess property after a default (citing N.Y. U.C.C. Law § 9-609)).  Thus, despite the absence of case law addressing whether the actions of a judgment creditor can violate section 463(2)(o), the Court concludes that based on the specific language of the statute, which specifies that it is unlawful for a franchisor to refuse to accept a return of the inventory at a fair and reasonable price, Hyundai Capital's repossession of Plaintiffs' inventory pursuant to its judgments and its action in disposing of the repossessed property are not subject to section 463(2)(o).  Accordingly, Plaintiffs have failed to state a claim against Kia under sections 463(2)(o) or 463(2)(u) of the New York Dealer Act.

### III. Conclusion

For the foregoing reasons, the Court grants the motions and dismisses Plaintiffs'

price-discrimination claims against Hyundai and all claims against Kia.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 29, 2016
       Brooklyn, New York